# Exhibit A

December 14, 2003

Analysis of Economic Loss, Stephen Dimino

Stephen Dimino was born on Feb. 9, 1953 and was therefore 48 years old on Sept. 11, 2001. At the time of his death he was a partner and vice president of the money market instrument (MMI) department at Cantor Fitzgerald. Mr. Dimino was first hired by Cantor Fitzgerald on Sept. 1, 1992. Prior to that he had worked for the Bank of New York. His earnings at Cantor Fitzgerald came from Securities Lending Desk income and partnership income, which I will describe separately.

1. Securities Lending Desk Earnings

Mr. Dimino was the VP in charge of the securities lending ("sec lending") desk at Cantor Fitzgerald. His compensation consisted of 20 percent of sec lending desk profits. This was paid in the form of a base salary of $150,000, plus a guaranteed bonus of $80,000, plus 20% of profits generated net of his base and bonus.[1] Thus, it is important to have a basic understanding of how sec lending works in order to understand the nature of Mr. Dimino's compensation.

Sec lending refers to a type of financial transaction in which one party sells a security with the intent of purchasing it back over a very short time horizon (usually just one or a few days). Essentially, the party gets a short-term loan, collateralized by securities.

There are many roles for sec lending transactions in financial management. For instance, consider a mutual fund that is holding certain bonds or equities. Rather than just letting the securities sit idle, they could loan them out to other parties on a short-term basis and earn interest, thus increasing the mutual fund's rate of return. Parties on the other side of such transactions would be entities who need such securities on a short-term basis (say, to satisfy a reserve requirement).

Conversely, we could consider a corporation that has a short run surplus or shortage of cash (due, say, to lumpiness in the timing of expenses and receipts). They can use sec lending transactions in their cash management. For instance, in the event of a cash surplus, a corporation can use a sec lending operation to loan out the excess cash for securities on a short-term basis. These securities then earn interest for the corporation (as opposed to just letting the cash lie idle). Other institutions that use sec lending operations regularly include insurance companies and pension funds.

Sec lending operations are important for the economy, because without them (or similar instruments) banks and other institutions mentioned above would have to

---

[1] The only significance of the distinction is that the base salary was paid in 24 installments during the year, and the guaranteed bonus was paid in installments during the year, while the 20% of net profits was paid in a lump sum sometime after the end of the fiscal year (Oct. 1 through September 30), after all sec lending desk profits for the year had been calculated.

maintain excessive cash balances (on average) to insure themselves against transitory cash shortfalls. This cash would usually lie idle (i.e., it is only being held as insurance against unusual circumstances), rather than being used for investment purposes.

Turning to Mr. Dimino's role, note that, at any given time, there are many banks, corporations, mutual funds, pension funds etc. that want to go long or short in the sec lending market. A sec lending desk manager like Mr. Dimino plays the role of a "market maker." That is, his activities effectively pair together those institutions that need short term cash with those who have excess cash to lend (i.e., those who want to buy vs. sell securities on a short term basis), in order to clear the market. This is exactly what would occur if the dealer ran what is called a "matched book," meaning that the securities he is lending out are exactly offset by securities he is taking in, at each point in time (i.e., he is lending out and borrowing equal amounts of money at each maturity date).

The person running the securities lending desk presumably does not see his activity in this broader economic context of clearing the market for short-term cash. He is trying to generate profits. Basically, Mr. Dimino generated profits for Cantor Fitzgerald in two ways: First, in the context of running a matched book, he could exploit bid/asked spreads on securities (i.e., lending out money at a slightly higher rate than he would borrow it). Second, he could run a mismatched book, which basically means borrowing more or less than you lend at various maturity dates. This procedure generates profits by exploiting very small predictable interest rate movements. Given the enormous volume of securities lending transactions in which Mr. Dimino was engaged, it is only necessary to generate a tiny profit per transaction in order to generate sizable annual profits.[2]

It is critical to understand that profits on sec lending transactions are a very stable source of revenue. This is because Mr. Dimino's profits were driven primarily by the <u>volume</u> of trading, and not by whether the prices of the assets being traded were rising or falling. And the volume of securities lending transactions has been steadily rising over time, independent of the cyclical condition of the economy. Thus, Mr. Dimino's sec lending desk income would not be sensitive to business cycle conditions or the general level of interest rates (in contrast, say, to stock market traders).

In recent years, overall sec lending volume has been growing substantially, because major markets are arising for more and more types of securities (e.g., at one time, the only major market was in U.S. Treasuries, but now there are markets in U.S. equities, European government bonds, mortgage backed securities, etc.). It is universally acknowledged that this trend will continue into the future. Mr. Dimino was involved in Cantor Fitzgerald's efforts to be a major player in these expanding markets, through its "equity matched book" and "securities lending" operations.  These operations had the potential to substantially increase Mr. Dimino's earnings, since he was also entitled to 20% of any profits they would generate in the future.

---

[2] A familiar result in basic asset pricing theory is that price changes are unpredictable if markets are efficient. Thus, for instance, interest rate changes should be unpredictable. The basic theory abstracts from small transactions costs, which generate very small predictable changes in asset prices. Only market makers dealing in extremely large volumes can exploit these tiny predictable movements profitably. It is important to bear in mind the distinction between exploiting small predictable interest rate movements (as in Mr. Dimino's work) vs. speculation on larger interest movements. The latter is a risky activity, while Mr. Dimino's work was not at all risky, as shown by his record of stable profits over many years that is described below.

Table 1 presents an analysis of Mr. Dimino's earnings history with Cantor Fitzgerald, from 1997 to 2001. The table shows his total compensation (i.e., 20% of sec lending desk profits), along with its separate components. Regarding the figures for 2001, note that we can construct a reasonable estimate of his income for the full year for the following reason: Mr. Dimino's compensation was based on 20% of sec lending profits over a fiscal year that ran October 1 through September 30. Thus, we know what his bonus would have been for almost the complete year, and we can extrapolate through to the end of September. Furthermore, we can easily extrapolate his base pay for 17 out of 24 pay periods to the full calendar year.

The data in Table 1 show that Mr. Dimino's earnings were not very sensitive to business cycle or stock market conditions. To highlight this fact, Table 1 also includes (in the last column) the annual rate of return on the SP500 for the 1997-2001 period. Note that Mr. Dimino's earnings were nearly as high during the poor market year of 2001 as they were in the very strong market year of 1997.[3]

Table 2 presents a reconciliation of the figures in Table 1 with Mr. Dimino's income tax records and W2 forms. The tax records and W2 forms for a particular year do not in general reflect what Mr. Dimino actually earned in that year, as is reflected by the discrepancies between the column labeled "taxable income from W2 form" in Table 2 and the column labeled "Total" column in Table 1. This is because some of Mr. Dimino's income was generally paid in a pre-tax form, and because some of his compensation was paid in stock grants or, in the case of his posthumous income for 2001, reported on form 1099-MISC rather than on form W2. Thus, the tax forms seriously understate in income.

Also note that Table 2 contains data on the whole period that Mr. Dimino was at Cantor Fitzgerald, 1993-2001. Table 1 only contains information from 1997-2001, because the broker review sheets that break down income from the securities lending desk into its components were not available before that date. Thus, for the 1993-1996 period we only have data on taxable income off the W2 form, and not total compensation. We know from Mr. Dimino's contract dated Aug. 7, 1995 that his compensation was based on 20% of sec lending desk profits as early as that date (but we do not have information prior to that date).[4]

2. Partnership Income

Stephen Dimino became a partner at Cantor Fitzgerald in 1995. As a partner, he was entitled to purchase partnership shares. The number of shares owned by a partner determine the fraction of Cantor Fitzgerald net earnings that is allocated to him/her as partnership income each year. At the time of his death, Mr. Dimino owned partnership shares with a total nominal value of $260,499 (see the 2001 K1 form). This sum has been paid out to his estate.

It is important to understand that Cantor Fitzgerald's shares do not trade publicly, so the nominal value of the shares does not necessarily reflect their true market value.

---

[3] Note that 2001 was a bad market year even before 9/11. The SP500 fell 6.8% during the first two quarters of 2001.

[4] The Aug. 7, 1995 contract specifies a base salary of $100,000. The new contract dated Sept. 29, 1999 is lost. The contract summary provided by Cantor Fitzgerald appears to be in error because it specifies a base salary of $100,000, while the broker reviews, as well as available pay stubs, clearly indicate $150,000.

3

The shares that Mr. Dimino owned at the time of his death were, according to any reasonable method of asset pricing, worth several times the 260 thousand dollar nominal value that was paid to his estate. This becomes apparent when we examine the annual income that those shares generated.

Table 3 summarizes Mr. Dimino's partnership income from 1995 through 2001. This table is based on a complete history of K1 forms from 1995 through 2000, along with the partners' statements from the first three quarters of 2001.

At the start of 2001 Mr. Dimino owned $200,828 worth of partnership shares (see the 2001 K1 form) and we see in Table 3 that these shares generated $84,211 in net income in just the first three quarters of 2001 – a 42% annual rate of return even without the 4th quarter. It has been typical for Cantor Fitzgerald partnership shares to earn rates of return in the 20-30% range since the firm was organized as a partnership in 1992.

Furthermore, the partnership shares are a rather safe asset, due to the stability of Cantor Fitzgerald's business. They are involved in market making activities, not just in securities lending but also in the Treasuries Repo market, and for many other assets as well. In all these businesses, the profits for the market maker derive primarily from the <u>volume</u> of trading, not from the direction of asset price changes (since, e.g., the market maker can make money off of bid/ask spreads). Trading volume in many asset markets is growing rapidly over time, leading to solid growth in Cantor Fitzgerald's overall profits.

If the Cantor Fitzgerald partnership shares were a publicly traded asset, then, given their high rate of return and low level of risk, their price would have to rise to bring their rate of return down – thus bringing it into line with other assets that bear similar risk. The price increase (relative to the price that Mr. Dimino could pay for shares) would have to be a factor of 4. Thus, I estimate that Mr. Dimino's partnership shares were worth roughly three quarters of a million dollars more than what his estate was paid for the shares.

Of course, it would be silly if the partnership shares were priced at what they were worth. Why would one work for years to become a partner, only to be told that one's reward is to be able to buy shares for what they are worth? Rather, a partner's entitlement to purchase shares at a fraction of their true economic value must be viewed as a major component of the partner's compensation.

And it should also be noted that Cantor Fitzgerald partnership shares are unlike other financial assets because they are not a passive investment. Rather, a partner must provide work effort to the firm in order to maintain his/her contractual right to own shares, as well as his/her privilege to purchase additional shares. According to the partnership agreement, as soon as a partner retires, the shares must be cashed out (at a fraction of their true value).

To deal with issue, I have included the annual income from partnership shares (reported in Table 3) as part of the base income that I use to forecast the present value of Mr. Dimino's future income. After having done this present calculation to obtain an estimate of economic loss, I will subtract out the $260,499 payment for the shares that his estate has already received. Thus, it will be treated as an offset.

3. Combined Income and Its Growth Rate

Table 4 presents Mr. Dimino's combined securities lending desk and partnership income from 1998 through 2001. Three features of this Table are worth noting. First, the $425,250 sec lending desk income figure for 2001 projects his base salary and bonus to the full year. Second, the $112,281 partnership income figure for 2001 projects the partnership income from the first three calendar quarters to the full year. Third, pre-tax benefits for 1993-1996 have been estimated, as described in the footnote to the table.

We can calculate the growth rate of Mr. Dimino's income over the 1993-2001 period by running a regression of the natural log of income on a constant and an annual time trend. The result is reported in the bottom panel of Table 4. This calculation indicates that Mr. Dimino's income grew at a 13.8% annual rate over this period.

Given this rapid income growth over the 1993-2001 period, in my opinion it would be inappropriate to apply the 3.78% income growth rate at age 48 that is specified in the rules. Because of the rapid growth of sec lending operations, and the growth potential of his partnership income, there is ample reason to believe that Mr. Dimino's income would have continued to grow at a relatively rapid rate. Furthermore, his earnings growth rates from ages 40 through 48 were consistently well above the rates specified in the rules.

On the other hand, it is well known that income growth rates do tend to decline with age, on average. Thus, I have adopted the assumption that Mr. Dimino's income would have continued to grow at the 13.8% rate through age 55. I then assume that his income growth rate would have gradually declined to 3% at age 65, and remain at 3% thereafter. This assumption represents a compromise between the type of growth rates specified in the rules, and the much more rapid growth rate we see in Mr. Dimino's income history.

4. Calculation of Base Income

Next, we need to construct a base income figure to be used in making present value of future earnings calculations. The construction of this base income figure is described in Table 5. I have used data from 1998-2001 to construct base income, since these are the years for which complete tax records are available.

The first page of Table 5 reports the nominal values of Mr. Dimino's sec lending and partnership income for 1998 through 2001. The unreimbursed employee business expenses that Mr. Dimino reported on his taxes are netted out to obtain a nominal net income figure for each year.

The second page of Table 5 describes how the net income figures for 1998 through 2001 are converted into 2001 dollars (using the Consumer Price Index). An average is then taken for the 4-year period 1998-2001. This gives a base income figure of $430,274 in 2001 dollars.

In subsequent calculations I have relied on this 4-year average from 1998-2001 as Mr. Dimino's base income level, and used the growth rates described in Section 3 to project this to ages 49 and beyond. Note that this is conservative relative to other base income figures that might be chosen. For instance, if I had used the 1999-2001 average as a base, the base would have been 4.8% higher.

5. Present value calculation

Table 6 presents a calculation of the present value of economic loss for Mr. Dimino. The calculation nets out estimated personal consumption expenditures. These are calculated as follows: Mr. Dimino was married with one surviving child. She will reach 19 in 2005 when Mr. Dimino would have reached age 52. Thus, I set the personal consumption share to 8.7% from ages 49 through 51 (which corresponds to years 2002-2004), and 12.5% from age 52 onward, which is consistent with the rules.

The calculations reported in Table 6 depart from the methodology specified in the rules in a number of ways that I feel are appropriate. First taxes are not deducted because New York State law clearly indicates that an award should be based on gross rather than after-tax income. Since I calculate the present value of expected future earnings gross of taxes, I must also depart from the rules in two other ways in order to maintain strict logical consistency of the procedure:

First, since I am calculating the present value of the deceased's gross future earnings, I must discount using a gross rate of return - as opposed to the net-of-tax rate of return specified in the rules. The rules specify a gross rate of return of 4.8%, and a net rate of return of 3.9%, and hence I adopt the former.[5] Use of this higher discount rate will reduce the amount of the calculated award, relative to what would have been obtained using the rate specified in the rules. It should also be stressed that use of a very low discount rate would be appropriate here, given the stability of securities lending earnings and their very low level of risk. Thus, a 4.8% rate is conservative.

Second, I must calculate personal consumption as a percent of gross income rather than net income. This departure from the rule will also have the impact of reducing the calculated economic loss.

Table 6 contains present value calculations for every possible worklife ending period, from age 49 through 70. The early years are included simply for completeness, so that one can check the accuracy of the calculations by examining how income grows and how the present value accrues over time. A critical issue is which age to choose as the last year of the expected worklife.

The rules specify use of the expected worklife estimates provided in Ciecka, Donley and Goldman (1999/2000). The rules further specify that their estimate for "all active men" at age 48 should be used. These figures imply an expected worklife of 14 additional years for the average 48 year-old active male, meaning that Mr. Dimino would be expected to work through age 62.

In my opinion it is highly inappropriate to use age 62 as the last year of the expected worklife for Mr. Dimino. Even the calculations in Ciecka, et al suggest using a later age. For 48 year-old active males with a college degree, they obtain an expected worklife estimate of 16.60 years.[6] This adjustment alone would extend Mr. Dimino's expected worklife through to age 65.

---

[5] This 4.8% gross rate of return assumption is conservative. To appreciate this, note that the Fidelity Cash Reserves money market fund, which is a safe taxable investment, and is one of the highest rated funds by Lipper, had an average annual rate of return of only 4.58% for the 10 years ending 8/31/02, and only 4.39% for the past three years.

[6] Mr. Dimino was actually a few credits short of earning a college degree. However, it is clear that he never finished the degree because he had already started a promising career in a highly technical and lucrative area. Such a person would be expected to behave like a college graduate rather than a high school graduate.

   Furthermore, there is substantial evidence that highly skilled professionals and those workers at the high end of the income distribution tend to work longer and more consistently. But more important is that all worklife estimates are just based on population averages, whose application in this case would be misleading. The particulars of Mr. Dimino's partnership agreement with Cantor Fitzgerald, which I discussed in section 2, create a tremendous economic disincentive for a partner to retire early. Under the structure of the partnership agreement, retirement at any age results in a very substantial economic loss. This is because one must cash out one's partnership shares for a nominal price that is only a fraction of their true economic value, and give up the stream of partnership earnings. Given this, partners at Cantor Fitzgerald would have a strong economic incentive to work past the typical retirement age for people with their demographic characteristics. To assume that Mr. Dimino would retire at age 65 would thus be overly conservative.

   Given his strong economic incentives to delay retirement, I feel that age 70 is a reasonable expected retirement age to use in Mr. Dimino's case. According to Table 6, the expected present value of Mr. Dimino's income over the remainder of his life (net of personal consumption) is $17,448,800 million if we assume he would have worked through age 70.[7]

   Finally, in calculating the economic loss it is necessary to net out the $260,499 that was received by Mr. Dimino's estate as a cash out for his partnership shares. This brings the estimated economic loss to $17,188,301.

   In conclusion, my best estimate of expected economic loss for Mr. Dimino is $17.2 million. I hold this opinion with a reasonable degree of economic certainty.

*Michael Keane* (signature)

Michael Keane
Professor of Economics
Yale University

---

[7] If taxes are deducted, I estimate that this figure is reduced to $12,950,045. In this calculation, I use an average effective tax rate of 32.9% calculated for the 1998-2001 period, reduced by 5% as per the rules to give 31.26%. Also, I use a 3.9% after tax rate of return as the discount rate, also as per the rules.

**Table 1: Securities Lending Desk Income for 1997-2001**

| Year | Base | Guaranteed Bonus | Additional Bonus | Total | SP500 |
|------|------|------------------|------------------|-------|-------|
| 1997 | 150,000 | 80,000 | 204,475 | 434,475 | 33.36 |
| 1998 | 150,000 | 80,000 | 80,200 | 310,200 | 28.58 |
| 1999 | 150,000 | 80,000 | 151,747 | 381,747 | 21.04 |
| 2000 | 150,000 | 80,000 | 62,481 | 292,481 | -9.10 |
| 2001 | 150,000 | 80,000 | 195,250[a] | 425,250 | -11.89 |

Note: Figures are taken from Cantor Fitzgerald broker review forms for 1997-2001.
   [a] The additional bonus that Mr. Dimino actually received for 2001 was $175,000. This was based on 20% of sec lending desk profits for the fiscal year, net of the base and guaranteed bonus. This is implies that the profits were $405,000 /(.20) = $2,025,000. Since, the fiscal year was defined as Oct. 1 to Sept. 30, the profits for the last 13 business days of the year (i.e., Wed. Sept. 12, 2001 through Fri. Sept. 28, 2001) were lost. I estimate that if these days were included, the total sec lending profits on which Mr. Dimino's compensation is based would have increased 5%, bringing them to $2,126,250. Thus, his total sec lending desk income, based on 20% of this figure, would have been $425,250. This implies his additional bonus would have been $195,250.

**Table 2: Reconciliation of Table 1 with Income Tax Records and W2 Forms**

| Year | Taxable Income From W2 Form | Pre-Tax Income | Other Forms of Compensation | Total Compensation (Securities Lending) |
|------|------|------|------|------|
| 1993 | 178,560 | na | na | Na |
| 1994 | 176,750 | na | na | Na |
| 1995 | 176,208 | na | na | Na |
| 1996 | 226,100 | na | na | Na |
| 1997 | 391,815 | 7,660[a] | 35,000[f] | 434,475 |
| 1998 | 294,400 | 15,800[b] |  | 310,200 |
| 1999 | 325,347 | 16,400[c] | 40,000[f] | 381,747 |
| 2000 | 265,321 | 7,160[d] | 20,000[f] | 292,481 |
| 2001 | 177,950 | 8,300[e] | 175,000[g] | 361,250[h] |

Notes: 1993 was Steven Dimino's first full year with CF. Prior to that he worked for the Bank of New York.

[a] Includes $2,200 for 401k, $5,460 for Family Medical Coverage (Cafe).
[b] Includes $9,800 for 401k, $6,000 for Cafe.
[c] Includes $9,500 for 401k, $6,900 for Cafe.
[d] Includes $6,900 for Cafe, $260 transit.
[e] Includes $2,656 for 401k, $5092 for Cafe, and $552 transit.
[f] Bonus paid in the form of stock grants. Each of these grants was actually received in the following year (i.e., the grant earned in 1997 was received in 1998, etc.).
[g] Bonus for fiscal year 2001 paid by Cantor Fitzgerald Securities (CFS) to the estate, and reported on 1099-MISC forms rather than on the W2 form. Recall that this omits the last 13 business days of the fiscal year (which ended on Sept. 30). I estimate that including these days would have increased the bonus from $175,000 to $195,250.
[h] This includes base salary for only 17 out of 24 pay periods. Projecting to 24 months increases base compensation from $106,250 to $150,000. This, as well as projecting the bonus payment of $175,000 to the full fiscal year, gives the total compensation of $425,250 for the 2001 calendar year reported in Table 1.

Table 3: Cantor Fitzgerald Partnership Income

|  | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 |
|---|---|---|---|---|---|---|---|
| Ordinary Income | 19,006 | 17,496 | 12,649 | 45,613 | 50,923 | 81,622 | 40,508 |
| Interest | 9,591 | 17,793 | 0 | 0 | 0 | 0 | 0 |
| Capital Gains | 0 | 0 | 0 | 0 | 48,282 | 16,142 | 55,169 |
| Charitable Contributions | (1,049) | (417) | (506) | (1,633) | (3,459) | (26,355) | (7,681) |
| Loan Interest | (9,074) | (17,097) | 0 | (5,158) | (9,558) | (6,863) | (2058) |
| Foreign Taxes | 0 | 0 | 0 | 0 | 0 | 0 | (1727) |
| Total | 18,474 | 17,775 | 12,143 | 38,822 | 86,188 | 64,546 | 84,211[a] |

Notes: Steven Dimino became a partner at CF in 1995.
   [a] The figures for 2001 are for the first three quarters. Projecting this to the full year gives $112,281.

## Table 4: Income Growth, 1993-2001

| Year | Total Sec Lending Compensation | Partnership Income | Total Income |
|------|-------------------------------|--------------------|--------------|
| 1993 | 184,753[a] | 0 | 184,753 |
| 1994 | 183,291[a] | 0 | 183,291 |
| 1995 | 183,152[a] | 18,474 | 201,626 |
| 1996 | 234,184[a] | 17,775 | 251,959 |
| 1997 | 434,475 | 12,143 | 446,618 |
| 1998 | 310,200 | 38,822 | 349,022 |
| 1999 | 381,747 | 86,188 | 467,935 |
| 2000 | 292,481 | 64,546 | 357,027 |
| 2001 | 425,250[b] | 112,281[c] | 537,531 |

Notes: 1993 was Stephen Dimino's first full year with CF.

[a] Since pre-tax benefits are not available for 1993-1996, I have estimated these benefits and added them to the taxable income reported in Table 2. I have assumed that 401k contributions were 1.36% of total compensation, since this was the average for the 1997-2001 period. I have assumed that health insurance costs grew 10% per year, and extrapolated back from the $5,460 figure for 1997. This procedure gives nontaxable compensation of $6,193 for 1993, $6541 for 1994, $6944 for 1995 and $8084 for 1996.

[b] The $425,2500 figure is obtained by extrapolating the base salary from 17 to 24 pay periods, and extrapolating the bonus to the end of the October 1, 2000 through September 30, 2001 fiscal year, as described in Table 1.

[c] The $112,281 figure is obtained by extrapolating the $84,211 figure for the first 3 quarters of 2001 (reported in Table 3) to the full year.

**Growth Rate Calculation**

Regression of natural log of income on a time trend:
$$\ln Income_t = 12.082 + .13803\, time$$
The coefficient on time in this regression gives the annual growth rate of income.

## Table 5: Earned Income in 1998-2001

<u>1998</u>

| | |
|---|---:|
| Securities Lending Desk | 310,200 |
| Partnership Total | 38,822 |
| Employee Business Expense | -13,805 |
| | |
| Total | 335,217 |

<u>1999</u>

| | |
|---|---:|
| Securities Lending Desk | 381,747 |
| Partnership Total | 86,188 |
| Employee Business Expense | -13,851 |
| | |
| Total | 454,084 |

<u>2000</u>

| | |
|---|---:|
| Securities Lending Desk | 292,481 |
| Partnership Total | 64,546 |
| Employee Business Expense | -14,544 |
| | |
| Total | 342,483 |

<u>2001</u>

| | |
|---|---:|
| Securities Lending Desk | 361,250 |
| Partnership Total | 84,211 |
| Employee Business Expense | -10,908 |
| | |
| Total | 434,553 |

<u>2001 - Extrapolated to 12 months</u>

| | |
|---|---:|
| Securities Lending Desk | 425,250 |
| Partnership Total | 112,281 |
| Employee Business Expense | -15,583 |
| | |
| Total | 521,948 |

Summary of Years 1998-2001

| Year | Net Income | Income in 2001 dollars | Conversion Factor |
|---|---|---|---|
| 1998 | 335,217 | 364,213 | 1.0865 |
| 1999 | 454,084 | 482,691 | 1.0630 |
| 2000 | 342,483 | 352,244 | 1.0285 |
| 2001 | 521,948 | 521,948 | 1.0000 |

Average Income (in 2001 dollars)

Average Income for 1998-2001 (in 2001 dollars) = $430,274

## Table 6: Present Value of Total Earnings (after personal consumption deduction), Base = 1998-2001

| Age | Income | Benefits | Per. Cons. | Net Income | Present Value |
|-----|--------|----------|------------|------------|---------------|
| 49 | 475352. | 12817. | 32707. | 455462. | 455462. |
| 50 | 540950. | 13074. | 37120. | 516904. | 948691. |
| 51 | 615601. | 13335. | 42139. | 586798. | 1482967. |
| 52 | 700554. | 13602. | 89270. | 624887. | 2025864. |
| 53 | 797231. | 13874. | 101388. | 709717. | 2614220. |
| 54 | 907249. | 14151. | 115175. | 806225. | 3251969. |
| 55 | 1032449. | 14434. | 130860. | 916023. | 3943384. |
| 56 | 1164790. | 14723. | 147439. | 1032074. | 4686714. |
| 57 | 1302659. | 15018. | 164710. | 1152967. | 5479082. |
| 58 | 1444057. | 15318. | 182422. | 1276953. | 6316463. |
| 59 | 1586625. | 15624. | 200281. | 1401968. | 7193717. |
| 60 | 1727690. | 15937. | 217953. | 1525673. | 8104652. |
| 61 | 1864334. | 16255. | 235074. | 1645516. | 9042142. |
| 62 | 1993482. | 16581. | 251258. | 1758805. | 9998281. |
| 63 | 2112004. | 16912. | 266114. | 1862801. | 10964573. |
| 64 | 2216836. | 17250. | 279261. | 1954825. | 11932157. |
| 65 | 2305106. | 17595. | 290338. | 2032364. | 12892046. |
| 66 | 2374259. | 17947. | 299026. | 2093181. | 13835379. |
| 67 | 2445487. | 18306. | 307974. | 2155819. | 14762442. |
| 68 | 2518852. | 18672. | 317191. | 2220334. | 15673516. |
| 69 | 2594417. | 19046. | 326683. | 2286780. | 16568879. |
| 70 | 2672250. | 19427. | 336460. | 2355217. | 17448800. |

Notes:

Average pre-tax benefits for 1998-2001, converted to 2001 dollars, are $12,566. Thus, the $430,274 average income over the period is broken down into a $417,708 average taxable component and a $12,566 average non-taxable component. The taxable income of $475,352 for 2002 is obtained by applying the 13.8% growth rate (calculated in Table 4) to the 2001 figure. This 13.8% growth rate is assumed to continue through age 55. It then drops linearly to 3% at age 65, and remains constant at 3% thereafter. The pre-tax benefit figure of $12,817 for 2002 is obtained by applying a 2% growth rate to the 2001 figure (as specified in the rules).

The present value is calculated using the 4.8% before tax interest rate specified in the rules.